<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                                    :
CARLOS ALIRIO R.R.,                        :
                                                    :          Civil Action No. 20-6217 (JMV)
                    Petitioner,                   :
                                                    :
          v.                                         :                **OPINION**
                                                    :
PAULO CORREIA, et al.,                    :
                                                    :
                    Respondent.               :
_____:

**VAZQUEZ, District Judge:**

This matter originated with a Verified Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241.  D.E. 1.  Presently pending before the Court is the amended petition and complaint filed by Petitioner Carlos Alirio R.R.,[1] ("Petitioner").  D.E. 5.  In addition to the merits of the action, Respondents challenge the Court's jurisdiction.  The Court concludes that it does have jurisdiction over this matter but denies Petitioner's request for immediate release.

## I.       BACKGROUND

Petitioner is an immigration detainee being held by the Department of Homeland Security, Immigration and Customs Enforcement ("DHS/ICE") at the Essex County Correctional Facility ("ECCF") in Newark, New Jersey.  The instant petition was filed in the wake of the ongoing COVID-19 pandemic,[2] that has been reported to have been contracted by both personnel and

_____

[1] Petitioner is identified herein only by his first name and the first initials of his surname in order to address certain privacy concerns associated with § 2241 immigration cases.  This manner of identification comports with recommendations made by the Judicial Conference of the United States' Committee on Court Administration and Case Management.

[2] COVID-19 is an abbreviation of the coronavirus disease 2019, a respiratory illness that can

detainees at ECCF.   D.E. 18.

Petitioner has been in ICE custody since on or about February 25, 2020.   D.E. 1-2 at 9. Petitioner is subject to discretionary detention under 8 U.S.C. § 1226(a).   D.E. 5 at ¶ 48.   On February 25, 2020, Petitioner was served with a "Notice to Appear" charging him as an alien present in the United States who has not been admitted or paroled.   D.E. 8-6 at 2-3.   Petitioner's criminal history is comprised solely of a domestic violence-related assault charge for which he was arrested on February 24, 2020, by the North Bergen Police Department.   D.E. 1-2 at 4-5, 8-7 at 2.   This charge is currently pending.   D.E. 1-2 at 9.   On March 12, 2020, Petitioner's request for bond-redetermination was denied by an immigration judge ("IJ") on the grounds that he poses a danger and is a flight risk.   D.E. 8-9 at 1.   On April 24, 2020, Petitioner's request for humanitarian release was denied by ICE.   D.E. 1-2 at 9.

On May 21, 2020, Petitioner filed the instant petition for writ of habeas corpus challenging the conditions of his confinement pursuant to 28 U.S.C. § 2241.   D.E. 1.   On May 5, 2020, he filed an "Amended Complaint."   D.E. 5.[3]   Petitioner asks the Court to, *inter alia*, order his immediate release and to award him costs associated with attorney fees under the Equal Access to Justice Act ("EAJA").   *Id.* at 19.   On June 2, 2020, Respondents filed their opposition.   D.E. 8. On June 3, 2020, the Court held a telephonic hearing with the parties to hear oral arguments.   D.E.

---

spread from person to person, that was declared a pandemic by the World Health Organization ("W.H.O.") on March 11, 2020.   *See* Centers for Disease Control and Prevention *Coronavirus Disease 2019 Frequently Asked Questions*, https://www.cdc.gov/coronavirus/2019-ncov/faq.html#covid19-basics (last visited Apr. 7, 2020); *see also* William Wan, *WHO declares a pandemic of coronavirus disease covid-19*, Washington Post, https://www.washingtonpost.com/health/2020/03/11/who-declares-pandemic-coronavirus-disease-covid-19/ (last visited Apr. 7, 2020).

3 As Respondents point out, the only apparent difference between the petition and the amended petition is the addition of the "verification of complaint" in the amended petition.

10.

### A.  COVID-19

The COVID-19 pandemic is at the heart of this case.   Judge John E. Jones III, in a

thoughtful opinion, described the situation as follows:

> In a matter of weeks, the novel coronavirus COVID-19 has
> rampaged across the globe, altering the landscape of everyday
> American life in ways previously unimaginable.   Large portions of
> our economy have come to a standstill. Children have been forced
> to attend school remotely.   Workers deemed 'non-essential' to our
> national infrastructure have been told to stay home.   Indeed, we
> now live our lives by terms we had never heard of a month ago—
> we are "social distancing" and "flattening the curve" to combat a
> global pandemic that has, as of the date of this writing, infected
> 719,700 people worldwide and killed more than 33,673.   Each day
> these statistics move exponentially higher.

*Thakker v. Doll*, Civ. Docket No. 20-cv-480, --- F. Supp. 3d ---, 2020 WL 1671563, *2 (M.D. Pa.

Mar. 31, 2020) (footnotes omitted).   Judge Jones accurately pointed to the swift growth of cases.

Since his opinion dated March 31, 2020, the number of worldwide cases and deaths has risen from

719,700 and 33,673 to 7,145,539 and 408,025.[4]

New Jersey has been particularly hard hit, with the northern part of the state bearing the

initial brunt.   As of June 9, 2020, New Jersey had 164,796 cases and 12,303 deaths.   *COVID-19*

*Information Hub*, STATE OF NEW JERSEY, https://covid19.nj.gov/ (last visited June 10, 2020).

The total number of cases and deaths for Bergen County, Essex County, and Hudson County,

respectively, were 18,573/1,628, 18,151/1,722, and 18,607/1,235 deaths.   *Id.*   New Jersey has

taken numerous steps, such as the Governor's initial stay-at-home order issued on March 21, 2020,

to combat the virus and subsequent decision to extend the public health emergency declaration for

---

4 *Coronavirus Disease (COVID-19) Pandemic*, WORLD HEALTH ORGANIZATION,
https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last visited June 10, 2020).

an additional thirty days.[5]   In addition, New Jersey has closed schools, beaches, state parks, and county parks.[6]   New Jersey has since relaxed some of its initial restrictions.[7]

COVID-19 is a type of highly contagious novel coronavirus that is thought to be "spreading easily and sustainably between people."   *How Coronavirus Spreads*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html ("*How Coronavirus Spreads*") (last visited May 14, 2020).   The National Institutes of Health reports that the virus "is stable for several hours to days in aerosols and on surfaces[.]"[8]   COVID-19 is "spread mainly from person-to-person."   *Id.*   This person-to-person spread can occur (1) between persons who are in close contact, meaning within six feet, and (2) by respiratory droplets when an infected person sneezes, coughs, or talks.   *Id.*   The virus can also be spread by infected persons who are not showing symptoms.   *Id.*

Symptoms of COVID-19 can be mild. However, the effects of COVID-19 can be drastically more severe in older individuals or those with certain medical conditions, including persons with asthma, lung disease, heart disease, diabetes, chronic kidney disease, liver disease or

---

5 *Murphy extends N.J. coronavirus public-health emergency for 30 days. State of emergency remains in effect*.   N.J.com, https://www.nj.com/coronavirus/2020/05/murphy-extends-nj-coronavirus-public-health-emergency-for-30-days-state-of-emergency-remains-in-effect.html (last visited May 12, 2020).

6 *New Jersey closes state parks, state forests and county parks as more than 200 new COVID-19 deaths reported*, 6abc, https://6abc.com/covid19-cases-us-coronavirus-symptoms/6083512/ (last visited April 7, 2020).

7 Megan Roos, *New Jersey Relaxes Coronavirus Restrictions, Allowing Nonessential Retailers to Open Next Week*, Newsweek, https://www.newsweek.com/new-jersey-relaxes-coronavirus-restrictions-allowing-nonessential-retailers-open-next-week-1503828 (last visited June 10, 2020).

8 *New Coronavirus Stable for Hours on Surfaces*, NATIONAL INSTITUTE OF HEALTH, https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces   (last visited April 8, 2020)

those who are immunocompromised.[9]   Besides death, COVID-19 can cause serious, potentially permanent, damage to lung tissue, and can require extensive use of a ventilator.   Early evidence suggests that the virus "can damage lung tissue causing a 20 to 30 percent decrease in lung function[.]"   D.E. 1 at ¶ 29 (citation omitted).   In addition, complications from the virus can manifest rapidly.   *Id.* (citation omitted).   There is currently no vaccine for COVID-19, nor are there known, clinically-tested therapeutic treatments.   *Id.* at ¶ 30.   To combat the virus, health officials have emphasized education, social distancing (*i.e.* staying at least 6 feet apart), and improved hygiene.   *Id.* (citation omitted).

### B.  Petitioner's Condition

Petitioner, who is thirty-seven years old, states that he is obese, has "borderline diabetes, body swelling and depressive disorder" as well as a history of infections and scarring in his abdominal area after an appendix removal.   D.E. 5 at ¶¶ 14, 37.   He also submits that he has experienced shortness of breath, although he does not provide any information about when this occurred.   *Id.* at ¶ 36.   On May 14, 2020, Petitioner underwent a rapid antibody screening and the result indicated that he test positive for IgG.   D.E. 6 at 1.   According to ECCF's medical director, Lionel Anicette, M.D., present IgG antibodies means that an individual *may* have developed immunity to COVID-19 after exposure.   D.E. 6-1 at ¶ 16.   ECCF only quarantines individuals with such test results if they are symptomatic, otherwise they are housed in general population.   *Id.*

---

9 *People Who Are at Higher Risk of Severe Illness*, CENTERS FOR DISEASE CONTROL AND PREVENTION,   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed April 8, 2020).

### C. ECCF Conditions

In response to the pandemic, ICE has taken affirmative steps to lessen the risk of exposure. ICE Guidance on COVID-19, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, https://www.ice.gov/coronavirus (last visited on June 5, 2020).  For example, ICE temporarily suspended all social visitation at detention facilities.  *Id.*  ICE also released approximately 160 individuals who were over the age of 60 or pregnant.  *Id.*  ICE further instituted screening guidance for new detainees and indicates that it is testing detainees for COVID-19 as per Center for Disease Control ("CDC") guidance.  *Id.*  Further, ICE provided a list of health conditions that detention facilities should consider in favor of release.  D.E. 8-3 at 1-2.

Respondents submitted a declaration from Alfaro Ortiz, the director of ECCF.  D.E. 8-5. Ortiz's declaration dated, June 1, 2020, provides that as of May 31, 2020, eight ICE detainees had tested positive for COVID-19.  *Id.* at ¶ 44.  Additionally, seventeen county inmates housed in Delaney Hall, seventeen of which are no longer in custody, tested positive,[10] as have eighty-eight members of the correctional staff, seventy-seven of whom have been cleared to resume work at the facility.  *Id.*  All staff members who were in proximity of those who tested positive, were sent home to self-quarantine for a fourteen-day period or sent to the hospital for testing.  *Id.*  Currently there are a total of 48 inmates and detainees in quarantine, in which they remain for a fourteen-day period.  *Id.* at ¶ 31.  ECCF places its inmates and detainees in quarantine for a numbers of reasons including: having close contact with an officer or staff member who is reported positive, close contact with a detainee or inmate who is reported positive, close contact with a detainee or inmate who reported symptoms, showing mild COVID-19 symptoms and/or based on the results

---

10 County inmates are housed in Delaney Hall, a separate building across the street from where immigration detainees are housed.  D.E. 16-5 at ¶ 31.

of ECCF's rapid antibody screening test.   *Id.*

In his declaration, Warden Ortiz details the efforts of ECCF to deal with the virus.   A major component has been keeping the population well below capacity in order to ensure adequate space to practice social distancing.   He reports that, among other things, ECCF is currently at approximately 67 percent of its maximum capacity, and the ICE detention areas that are normally configured to house 60 detainees per pod, are now reduced to a maximum of 48 detainees.   D.E. 8-5 at ¶¶ 4-5.   Moreover, the pods allow for all detainees to sit at least six feet apart.   *Id.* at ¶ 6. Inmates recreation periods have been modified to allow for fewer inmates to have recreation at the same time, thereby facilitating social distancing.   *Id.* at ¶ 20.   Social visits were suspended on March 22, 2020, and attorney visits can now be arranged in a dedicated room within the visitor's lobby wired to support video conferencing between the detainee and his attorney.   *Id.* at ¶ 20.

Health care at the facility is administered by CFG Health Systems and an on-site physician director (who is available twenty-four hours), as well as several registered nurses ("RN"), licensed practical nurses ("LPN"), nurse practitioners and physician assistants.   *Id.* at ¶ 12.   There is always a nurse practitioner in the facility twenty-four hours a day, and a physician at the facility sixteen hours a day.   *Id.* at 13.   A physician is on call on a 24-hour basis for emergency needs. (*Id.*)   The medical department has also established a new protocol for handling inmates/detainees who may suffer from health conditions that would classify them as being at a high risk of suffering severe complication from COVID-19, by housing them separately.   *Id.* at ¶ 33.   ECCF requires that all detainees and inmates undergo medical screening including temperature readings before admission in the facility.   *Id.* at ¶ 11.

If a detainee complains of COVID-19 symptoms, he is immediately evaluated and provided a surgical mask if he presents with symptoms.   *Id.* at ¶ 22.   Moderate to severely symptomatic

detainees are immediately taken to University Hospital for medical evaluation or COVID-19 testing.  D.E. 8-5 at ¶ 30.   Those who test positive, but who do not require hospitalization, are quarantined in their own cell in a unit that is exclusively being used for inmates/detainees with positive COVID-19 results.  *Id.*  Asymptomatic detainees who have had a known exposure to COVID-19, are "co-horted" with other similarly situated detainees, for fourteen days.  *Id.* at ¶ 33.

ECCF does administer COVID-19 tests to its entire population, but rather focuses on individuals with COVID-19 symptoms.  D.E. 8-5 at ¶ 45.   ECCF utilizes a supplementary screening tool to test for COVID-19 antibodies.   This screening tool differs from laboratory testing for COVID-19, as the patient is examined through a blood test to minimize risk to healthcare providers.  *Id.*

ECCF also educates detainees as to the "importance of hand washing and best practices to prevent the spread of COVID-19."  *Id.* at ¶ 19.   As of May 15, 2020, ECCF has a sixteen-month supply of soap.  *Id.* at ¶ 25.   Detainees have unlimited access to free bars of soap although they are not provided hand sanitizer.  *Id.* at ¶ 24.   Additional cleaning staff have been hired in order to increase the frequency of cleaning each day.  *Id.* at ¶ 19.   ECCF was designed with air handlers and a purge system in every housing unit that allows for fresh air to be circulated within the facility every four hours.  *Id.* at ¶ 17.   As of May 15, 2020, ECCF had, among other things, a supply of 165 gallons of alcohol-based sanitizer, 3,950 Tyvek suits, 3,900 N95 masks and 43,700 surgical masks which correctional officers use when working with high-risk detainees.   (*Id.* at ¶ 25.)

## II.     LEGAL STANDARD

The standard for granting a temporary restraining order is the same as that for a preliminary injunction.   Injunctions and restraining orders are governed by Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1.   Injunctive relief may only be granted when a party demonstrates

that he has a reasonable probability of success on the merits, he will suffer immediate and irreparable harm if the injunction does not issue, the grant of preliminary relief will not result in greater harm to the nonmoving party, and the injunctive relief is in the public interest.   *New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 385-86 (3d Cir. 2012) (citing *Crissman v. Dower Down Entm't Inc.*, 239 F. 3d 357, 364 (3d Cir. 2001).

However, before conducting the injunctive relief analysis, the Court must determine whether Section 2241 permits Petitioner to seek the relief requested here.   Respondents submit that the Court lacks jurisdiction to decide the matter pursuant to Section 2241.   D.E. 8 at 17-20

This Court, and several other district judges, have previously determined that Section 2241 is the appropriate vehicle for the injunctive relief sought.   *See, e.g.*, *Rafael L.O. v. Tsoukaris*, Civ. Action No. 20-3481, 2020 WL 1808843 (D.N.J. Apr. 9, 2020).   At the time, Respondents did not argue against this analysis, instead asserting that petitioners lacked standing.   Respondents, however, have now challenged the Court's jurisdiction under Section 2241.[11]   For the reasons that

---

[11] In a thorough opinion, Judge Bumb recently determined that Section 2241 does not permit federal inmate habeas petitioners to challenge their conditions of confinement.   *Wragg v. Ortiz*, Civ. -F. Supp. 3d -, No. 20-5496, 2020 WL 2745247 (D.N.J. May 27, 2020).   Judge Bumb addressed a putative class action filed by federal prisoners, rather than a civil immigration detainee like Petitioner.   In her opinion, Judge Bumb noted that respondents distinguished federal inmates from civil immigration detainees vis-à-vis a Section 2241 analysis.   Judge Bumb observed the following:

> Respondents concede, as they must, that some district courts have found habeas jurisdiction based on civil immigration detainees' risk of contracting COVID-19 in detention facilities. Not only are those cases not controlling, Respondents point out, but they are not persuasive *because civil immigration detainees do not have the same statutory or regulatory avenues for relief as prisoners who can seek home confinement through the CARES Act or make a compassionate-release request to the BOP and a motion to the sentencing court seeking compassionate relief under 18 U.S.C. § 3582(c)(1)(A). More importantly, Respondents distinguish the constitutional claims of civil immigration detainees from those of*

9

follow, the Court acknowledges that it is not clear whether Petitioner can maintain his action under Section 2241, as a civil rights action pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971),[12] or both.   However, it is equally clear to the Court that Petitioner will, at a minimum, be able to proceed under either Section 2241 or *Bivens*.

As to the Court's authority to grant release on a writ of habeas corpus, the Third Circuit's decision in *Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986) appears to acknowledge such authority. *Lucas* concerned a state prisoner's petition pursuant to 28 U.S.C. § 2254 rather than a civil immigration detainee matter.   *Id.* at 365-66.   The court in *Lucas* determined that the "extraordinary circumstances" standard controlled in determining whether "bail may be granted to a habeas petitioner prior to a ruling on the merits of the petition."   *Id.* at 367.   As an example of such circumstances, the *Lucas* court pointed to *Johnston v. Marsh*, 227 F.2d 528 (3d Cir. 1955), in which the district judge had ordered a state inmate released to enter a hospital because the inmate was extremely ill.   *Id.* at 366-67.   Yet, the court in *Lucas* court continued, it was not suggesting that a petitioner's poor health would be the only situation that would meet the extraordinary

---

> prisoners because they fall under the Fifth Amendment, which provides them "*more considerate treatment than convicted prisoners.*" (Gov't Brief, ECF No. 28-1 at 54) (citing *Jeferson V.G. v. Decker*, No. 20-3644, 2020 U.S. Dist. LEXIS 65905, at \*15 n.5 (D.N.J. Apr. 15, 2020) (citing *Fuentes v. Wagner*, 206 F.3d 335, 344 (3d Cir. 2000))). Respondents suggest that different interests are at stake when considering whether to release a civil immigration detainee or a criminal defendant who is serving a sentence.

*Wragg*, 2020 WL 2745247 \*16 (emphasis added).   Respondents in *Wragg* were represented by the same office that is representing Respondents in this matter.

[12] "*Bivens* is the short-hand name given to causes of action against federal officials for alleged constitutional violations."   *Bistrian v. Levi*, 912 F. 3d 79, 88 (3d Cir. 2018).

circumstances standard.  *Id.* at 367.[13]

Respondents, however, point to a different line of Third Circuit cases that limit the reach of Section 2241, albeit in the federal inmate context.   In *Woodall v. Fed. Bureau of Prisons*, 432 F. 3d 235 (3d Cir. 2005), the petitioner challenged Bureau of Prison ("BOP") regulations.   The sentencing judge had recommended to the BOP that the petitioner serve the last six months of his sentence in a halfway house (a type of "Community Correction Center" or "CCC"), but the regulations prohibited such an early release.  *Id.* at 237-388, 240.   Ultimately, the Third Circuit found the regulations improper in light of the relevant statutes.  *Id.* at 244-50.

Before reaching the substantive question, the *Woodall* court first addressed whether the petitioner's claim was cognizable under Section 2241.  *Id.* at 241.   The court analyzed the two habeas statutes available to federal prisoners:   Section 2241 and 28 U.S.C. § 2255; the former addressed "execution" of a sentence while the latter concerned the validity of a conviction or sentence.  *Id.*   (citing *Coady v. Vaughn*, 251 F. 3d 480, 485 (3d Cir. 2001).[14]   The Circuit acknowledged that the "precise meaning of 'execution of a sentence' is hazy."  *Id.* at 242.   Yet, after analyzing cases from other circuits, the *Woodall* court settled on the plain meaning of

---

[13] Like injunctive relief in general, granting bail to a habeas petitioner is an extraordinary remedy. *See Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of success, and ... when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective") (citation omitted)); *see also In re Souels*, 688 F. App'x 134, 135-36 (3d Cir. 2017).

[14] The respondent in *Woodall* argued that conditions of confinement fell outside the reach of habeas, citing to, among other decisions, *Nelson v. Campbell*, 541 U.S. 637 (2004).  *Id.* at 242 n.3.   The *Woodall* court disagreed, finding that *Nelson* addressed the reach of 42 U.S.C. § 1983 before it invaded habeas jurisdiction.  *Id.* (citing *Nelson*, 541 U.S. at 639).   But, the court in *Woodall* continued, *Nelson* did not rule that habeas relief was unavailable even if the remedy was also permissible under Section 1983.  *Id.*

execution, that is "to 'put into effect' or 'carry out.'"   *Id.* at 242-43 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 794 (1993)).   The Third Circuit then concluded that the matter involved an execution of the petitioner's sentence, and was therefore properly brought under Section 2241, because a transfer from a prison to a CCC represented "more than a simple transfer" or a "garden variety prison transfer."   *Id.* at 243.   *See also Ganim v. Fed. Bureau of Prisons*, 235 F. App'x 882 (3d Cir. 2007) (finding that Section 2241 did not apply because the Petitioner challenged a decision "relating to a simple or garden variety transfer" when the BOP refused to transfer the petitioner to another facility so that he could be closer to his family).

In another case, *McGee v. Martinez*, 627 F. 3d 933, 934 (3d Cir. 2010), the Section 2241 petition concerned the Inmate Financial Responsibility Plan ("IFRP"), 28 C.F.R. §§ 545.10, 545.11.   The Third Circuit framed the issue as whether the petitioner could maintain the case under Section 2241 "or whether he must re-file it as a civil rights action under *Bivens*[.]"   *Id.*   The court in *McGee* observed that when a petitioner challenges a condition of confinement, and a favorable outcome would not alter his conviction or sentence, a civil rights action under *Bivens* or 42 U.S.C. § 1983 is appropriate.   *Id.* at 936 (citing *Leamer v. Fauver*, 288 F. 3d 532, 542 (3d Cir. 2002)).   The Third Circuit then indicated that the IFRP is designed to encourage an inmate to meet his financial obligations imposed at sentencing.   *Id.* at 936.   As a result, the Circuit continued, the IFRP is a means to execute a sentence.   *Id.*   The *McGee* court concluded that because the petitioner's case involved the execution of his sentence, it was properly brought under Section 2241.   *Id.* at 936-37.

The Circuit reached the opposite conclusion in *Cardona v. Bledsoe*, 681 F. 3d 533 (3d Cir. 2012).   In that case, the petitioner filed a Section 2241 action challenging the BOP's decision to place him in the Special Management Unit ("SMU").   *Id.* at 534.   Like *McGee*, the *Cardona* court

once again framed the issue as whether the matter was properly brought under Section 2241 or whether the petitioner "must instead file a civil rights action under *Bivens*[.]"   *Id.* at 534;   537 n.9 ("We have held that a challenge to the conditions of an inmate's confinement may be brought in a civil rights action."   (citing *McGee*, 627 F. 3d at 936)).   The court in *Cardona* decided that the petitioner's action was not appropriate under Section 2241.   *Id.* at 538.   The Third Circuit reasoned that the petitioner had not alleged that the BOP's action was inconsistent with a recommendation or command in the sentencing judgment.   *Id.* at 537.   The Circuit then turned to the petitioner's claim that placing him in the SMU could lead to a loss of his good time credits, which could impact the length of his confinement.   *Id.* at 537.   The *Cardona* court rejected this argument because even if the petitioner won, it did not "necessarily imply" that he would serve a shorter sentence.   *Id.* (citing *Leamer*, 288 F. 3d at 543).[15]

The foregoing cases certainly seem to indicate – at least as to federal inmates – that an action which is not viable under Section 2241 can nevertheless be brought as a *Bivens* action. However, after these decisions, the United States Supreme Court in *Ziglar v. Abassi*, __ U.S. __, 137 S. Ct. 1843 (2017), addressed matters falling under *Bivens* and its progeny.   *Abassi* involved a suit by "six men of Arab or South Asian descent[,]" five of whom were Muslims, who were taken into custody as illegal aliens following the September 11, 2001, terrorist attacks.   *Id.* at 1852, 1853.   While detained, the men were allegedly subject to harsh conditions of confinement along with both physical and verbal abuse.   *Id.* at 1853.   The detainees brought four claims under *Bivens*.[16]   *Id.*   The Supreme Court found that the *Bivens* claims challenged conditions of

---

[15] The Third Circuit has also ruled that a civil rights claim is not converted to a Section 2241 matter merely because a federal inmate requests her release as a remedy.   *Gillette v. Territory of Virgin Islands*, 563 F. App'x 191, 195 (3d Cir. 2014)

[16] The detainees also brought a claim under 42 U.S.C. § 1985(3), which was dismissed on

confinement and fell into two general categories:   "detention policy claims" and claims concerning the warden's permitting guards to abuse detainees.   *Id.* at 1858-59.

The Supreme Court traced the history of *Bivens*-type actions, starting with the seminal case in which the Court permitted a damages remedy for persons injured by an unreasonable search and seizure.   *Id.* at 1854 (citing *Bivens*, 403 U.S. at 397).   The *Abassi* Court noted that *Bivens* claims had only been extended to two areas:   gender discrimination by a Congressman in violation of the Fifth Amendment Due Process Clause and failure to provide medical treatment to a prisoner in contravention of the Eighth Amendment's Cruel and Unusual Punishments Clause.   *Id.* at 1854-55 (citing *Davis v. Passman*, 442 U.S. 228 (1979) and *Carlson v. Green*, 446 U.S. 14 (1980)). However, the Court also pointed out that it had not extended *Bivens* to a number of other areas, including military matters and private prisons.   *Id.* at 1857 (citations omitted).   The *Abassi* Court attributed this change in *Bivens* jurisprudence not only to the facts of particular cases but also to a shift in the Supreme Court's analysis of such matters.   *Id.* at 1855.   As the Supreme Court recognized, it had adopted a cautious approach in extending *Bivens* to other constitutional violations such that a *Bivens* remedy was now "disfavored."   *Id.* at 1855-57.   As a result, the Court in *Abassi* continued, it would not extend *Bivens* remedies "if there are '*special factors* counseling hesitation in the absence of affirmative action by Congress.'"   *Id.* at 1857 (emphasis added) (quoting *Carlson*, 446 U.S. at 18).

As to special factors, the *Abassi* Court ruled that "the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed."   *Id.* at 1857-58.   The Supreme Court

---

qualified immunity grounds.   *Id.* at 1854, 1865-69.

added that certain matters – such as the military, the public purse, and federal land – in which Congress has "designed its regulatory authority in a guarded way" would counsel against an extension of *Bivens*.  *Id.* at 1858.   Other times, the Court continued, a particular "feature of a case" may caution against permitting a new *Bivens* action.   *Id.*   The *Agassi* Court added that "if there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action."   *Id.*

Turning to the claims before it, the Supreme Court first addressed the detention policy claims.   *Id.* at 1858.   The Supreme Court determined that the allegations constituted a new[17] *Bivens* claim and were therefore subject to the special factors analysis.   *Id.* at 1860.   The Court described the detention policy claims as a challenge to the "confinement conditions imposed on illegal aliens pursuant to a high-level executive policy created" after the September 11 attacks.  *Id.*   The Court in *Abassi* ruled that a *Bivens* claim was an improper manner to challenge an entity's

---

[17] The *Abbasi* Court also addressed a threshold issue, that is, whether the asserted *Bivens* claim was an already recognized cause of action or an attempt to create a new *Bivens* action.   To that the end, the Court indicated the following:

> The proper test for determining whether a case presents a new *Bivens* context is as follows. If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new. Without endeavoring to create an exhaustive list of differences that are meaningful enough to make a given context a new one, some examples might prove instructive. A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1859-60.

policy.  *Id.*  (citation omitted).  Relatedly, the Court continued, discovery and litigation would veer into discussions and deliberations in formulating the policy.  *Id.* at 1860-61.  The *Abassi* Court continued that the detention policy claims would also require "an inquiry into sensitive issues of national security[,]" which weighed against a *Bivens* money damages claim.  *Id.* at 1861. The Supreme Court further noted that Congress' inaction in the 16 years since the September 11 attacks also countenanced against finding a new cause of action.  *Id.* at 1862.

The *Abassi* Court then observed that the detainees may have other avenues to pursue relief:

> [W]e have left open the question whether [the detainees] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus. See *Bell v. Wolfish,* 441 U.S. 520, 526, n. 6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement"); *Preiser v. Rodriguez,* 411 U.S. 475, 499 (1973) ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal").

> Indeed, the habeas remedy, *if necessity required its use*, would have provided a faster and more direct route to relief than a suit for money damages. A successful habeas petition would have required officials to place respondents in less-restrictive conditions immediately; yet this damages suit remains unresolved some 15 years later.

*Id.* at 1862-63 (emphasis and second alteration added).  As a result, the Court stated that the detainees had other forms of judicial relief available which meant that a *Bivens* damages remedy was usually not.  *Id.* at 1863 (citations omitted).

The Supreme Court concluded that it therefore would not extend *Bivens* to the detention policy claims.  *Id.*  As to the second category – the warden permitting officers to abuse detainees – the Court acknowledged that it may be a viable new *Bivens* claim but remanded the matter for a special factors analysis in the first instance.  *Id.* at 1863-65.

16

Critically, the Court in *Abassi* limited its ruling to cases in which petitioners sought money damages.   *See, e.g.*, *id.* at 1854 ("The Court . . . would enforce a damages remedy[.]"), 1857 ("The question is 'who should decide' whether to provide for a damages remedy, Congress or the courts?"  (citation omitted)); 1858 ("[T]he decision to recognize a damages remedy requires an assessment of . . . .   [I]f there are sound reasons to think that Congress might doubt the efficacy or necessity of a damages remedy . . . ."); 1861 ("Allowing a damages suit in this context . . . .  These considerations also counsel against allowing a damages claim to proceed . . . .   Were the inquiry to be allowed in a private suit for damages . . . .")   The Supreme Court clearly delineated an action for injunctive relief as opposed to one for damages.   *See, e.g.*, *id.* at 1858 ("It is true that if equitable remedies prove insufficient, a damages remedy might be necessary to redress past harm and deter future violations."); 1861 ("These concerns are even more pronounced when the judicial inquiry comes in the context of a claim seeking money damages rather than a claim seeking injunctive or other equitable relief.").   To this end, even when rejecting the application of *Bivens* to detention policy claims, the *Abbasi* Court ruled that "[t]o address those kinds of decisions, detainees may seek injunctive relief."   *Id.* at 1862.

In light of the foregoing, the Court concludes that Petitioner may maintain this action under both Section 2241 and a *Bivens* claim for *injunctive* relief.   *See Woodall*, 432 F. 3d at 242 n. 3.  Alternately, the Court concludes that the Third Circuit will permit the action to proceed as either a Section 2241 matter or a *Bivens* claim for injunctive relief.   Moreover, whether the Court reviews Petitioner's claims under Section 2241 or *Bivens*, the Court must conduct the same substantive analysis, that is, whether Petitioner has shown that he is entitled to injunctive relief due to a violation of the Fifth Amendment's Due Process Clause.

At the outset, the Court acknowledges that if Petitioner was a federal inmate, Third Circuit

precedent would preclude an action under Section 2241.   Petitioner is not challenging the "execution of his sentence"; in fact, Petitioner has not been sentenced at all because he is a civil immigration detainee.   The Third Circuit has not ruled that Section 2241 is unavailable in this context.   And the Court finds persuasive the reasoning of respondents in *Wragg*, which Judge Bumb adopted:

> [B]ecause civil immigration detainees do not have the same statutory or regulatory avenues for relief as prisoners who can seek home confinement through the CARES Act or make a compassionate-release request to the BOP and a motion to the sentencing court seeking compassionate relief under 18 U.S.C. § 3582(c)(1)(A). More importantly, Respondents distinguish the constitutional claims of civil immigration detainees from those of prisoners because they fall under the Fifth Amendment, which provides them "more considerate treatment than convicted prisoners." (Gov't Brief, ECF No. 28-1 at 54) (citing *Jeferson V.G. v. Decker*, No. 20-3644, 2020 U.S. Dist. LEXIS 65905, at *15 n.5 (D.N.J. Apr. 15, 2020) (citing *Fuentes v. Wagner*, 206 F.3d 335, 344 (3d Cir. 2000))). Respondents suggest that different interests are at stake when considering whether to release a civil immigration detainee or a criminal defendant who is serving a sentence.

*Wragg*, 2020 WL 2745247 *16 (emphasis added).

This reasoning is consistent with the Supreme Court's "necessity" of "use" observation as to habeas relief in *Abassi*.   *Abassi*, 137 S. Ct. at 1863.   The Court recognizes that the *Abassi* Court did not definitively hold that habeas relief was available to immigration detainees.   But at the same time, the Supreme Court also ruled that the detainees did *have* other forms of relief available to them, *id.*, which strongly suggests that the Supreme Court would find a habeas action cognizable, at least where necessity required it to do so.   Not only has this Court found Section 2241 to be applicable in civil immigration matters, so have numerous other district judges.   *See Jaime F. v. Barr*, Civ. No. 19-20706, 2020 WL 2316437 *2 (D.N.J. May 11, 2020) (citing case by way of examples).

18

The Court likewise finds that Petitioner can proceed with a *Bivens* action for *injunctive* relief, as opposed to money damages.   As noted, the *Abassi* Court took great pains to distinguish between injunctive relief and damages, concluding that the detainees could have sought injunctive relief – even as to the detention policy claims.   *Abassi*, 137 S. Ct. at 1862.   As a result, Petitioner here may also seek injunctive relief for the alleged constitutional violations.   Because *Abassi* did not prohibit an action seeking injunctive relief, the Court need not decide whether Petitioner asserts a new *Bivens* cause of action for money damages.   Nevertheless, as to the special factors analysis, the Court notes that the Supreme Court's decision *Carlson v. Green*, 446 U.S. 14 (1980), concerning the Eighth Amendment is similar to the inquiry that the Court would have to conduct here.   Moreover, this Court has not ruled that ICE's overall, nationwide policy as to housing detainees is unconstitutional; instead, the Court has focused on particular facilities and how each has coped with the pandemic.   The Court has also considered the individual circumstances of each petitioner.

As noted, the Court is not aware of binding precedent that Section 2241 is not applicable to a civil immigration detainee alleging unconstitutional conditions of confinement.   The Court predicts that the Third Circuit will find, at minimum, that Petitioner can proceed under either Section 2241 or *Bivens* (for injunctive relief).   The Court recognizes that if the Circuit determines that Petitioner is foreclosed from seeking Section 2241 relief, it will be a major factor in determining that a *Bivens* action is viable.   *See Bistrian*, 912 F. 3d at 90 (3d Cir. 2018) (noting that in determining whether a new *Bivens* action should be recognized, two factors are "particularly weighty: the existence of an alternative remedial structure and separation-of-powers principles" (citation omitted)).   At the same time, the Court acknowledges that if a *Bivens* action is not available to Petitioner, then it may very well lead to the "necessity" of permitting a Section 2241

claim announced by the *Abassi* Court.   *Abassi*, 137 S. Ct. at 1863.

### III.    DISCUSSION

Although the Court has jurisdiction, the Court finds that Petitioner has not established a reasonable likelihood of success on the merits.   Before delving into the relevant analysis in this case, the Court notes the following.   The Court is well-aware of the seriousness of the COVID-19 pandemic, and the Court likewise recognizes that county jails and detention facilities were not designed with pandemics in mind.   During the pandemic, the Court has received requests for habeas relief from civil immigration detainees that fall into three general categories:   (1) detainees who do not fall into a particularly vulnerable category; (2) detainees who fall into a particularly vulnerable category (based on age or underlying medical/physical conditions); and (3) detainees who have tested positive for COVID-19.   As to the first category, the Court has denied relief without prejudice.   At the same time, the Court recognizes that merely because a person does not fall into a vulnerable category does not mean that he or she will not experience severe symptoms if he or she contracts the virus.   The Court has denied those petitions without prejudice because information concerning COVID-19 is subject to change, and as additional information becomes available, the Court could reach a different conclusion as to those detainees who currently are not considered unusually vulnerable.   As to the second category, the Court has ordered release provided that the legitimate interests of ICE (in particular, flight risk and dangerousness) can be accommodated by the conditions of release.   As to the third category – detainees who have the virus – the Court has found that the analysis changes.   Before a detainee contracts the virus, the public has an interest in preventing further positive cases.   In addition to the health and welfare of the detainee, the public also has an interest in seeing that scarce medical resources are conserved.   Yet, once a detainee tests positive, the public also has an interest in not introducing additional

cases into the general public.   Once a detainee tests positive, in the Court's view, the critical

question is whether the detainee is receiving constitutionally adequate care.   As a result, once a

detainee tests positive, the Court does not order release but instead remains available on short

notice to address any issues that may arise as to adequacy of medical care.   To this end, the Court

has inquired of facilities as to whether detainees can seek medical attention twenty-four hours a

day (in case symptoms worsen) and, if necessary, how long it will take to transport a detainee to a

hospital or medical center.

Petitioner is a civil detainee as opposed to a criminal prisoner who has been convicted and

sentenced.   Therefore his conditions of confinement claim will be analyzed under the Due Process

Clause of the Fifth Amendment, as opposed to the Eighth Amendment.   *Bell v. Wolfish*, 441 U.S.

520, 535-36 (1979).   Civil immigration detainees are entitled to the same due process protections

as pretrial detainees when the conditions of confinement fall below constitutional minimums.[18]

*E.D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019).

---

[18] Petitioner also raises a "deliberate indifference" claim.   D.E. 5 at ¶¶ 65-69. Because the current pandemic represents unchartered territory in recent jurisprudence, the parties are understandably drawing from analogous situations.   One of those situations is cruel and unusual punishment under the Eighth Amendment, which applies a deliberate indifference standard to medical treatment (or lack thereof). *See*, e.g., *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581-82 (3d Cir. 2003); *Parkell v. Morgan*, 682 F. App'x 155, 159-60 (3d Cir. 2017); *King v. Cnty. Of Gloucester*, 302 F. App'x 92, 96 (3d Cir. 2008).   "To act with deliberate indifference to serious medical needs, is to recklessly disregard a substantial risk of serious harm."   *Harvey*, 263 F. App'x at 191 (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) and *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

However, the Court finds that the Eighth Amendment is not applicable because Petitioners are not convicted criminal inmates but civil immigration detainees.   As noted, the Court evaluates the Petitioners' claims under the Due Process Clause of the Fifth Amendment, which prohibits "punishment" of a civil detainee.   *See Natale*, 318 F.3d at 581; *see also Hubbard v. Taylor*, 399 F.3d 150, 157-60 (3d Cir. 2005).   As a result, the Court finds that the deliberate indifference standard merely sets the floor, rather than the ceiling, of constitutionally required medical care in this matter.

The Third Circuit has articulated the following relevant standards:

> To determine whether challenged conditions of confinement amount to punishment, this Court determines whether a condition of confinement is reasonably related to a legitimate governmental objective; if it is not, we may infer "that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees *qua* detainees."

*E. D. v. Sharkey*, 928 F.3d 299, 307 (3d Cir. 2019) (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)).   As a result, the Court must ascertain whether the confinement conditions serve a legitimate purpose and whether the conditions are rationally related to that legitimate purpose. *Hubbard* 538 F.3d at 232.

A condition or purported deprivation amounts to punishment if the "disability is imposed for the purpose of punishment"; no "alternative purpose to which may rationally be connected is assignable for it" or is "excessive in relation to the alternative purpose assigned [to it]."   *Bell*, 441 U.S. at 538 (internal citation omitted).   The "inquiry into whether given conditions constitute punishment must consider the totality of circumstances within an institution."   *Hubbard*, 399 F.3d at 160 (internal quotation marks and citations omitted).

District Courts have reached different conclusions when conducting this inquiry in the context of the current pandemic.   In *Dawson v. Asher*, Case No. C20-0409, 2020 WL 1304557 (W.D. Wash. Mar. 19, 2020), Judge James L. Robart found that the immigration detainees did not face improper punishment.   *Id.* at *2.   Judge Robart explained that the petitioner's detention was reasonably related to a legitimate governmental objective because there was no evidence that the respondents intended to punish the petitioners, respondents had a legitimate governmental objective in preventing detained aliens from absconding and ensuring their appearance at removal

22

proceedings, and the petitioners' confinement did not appear excessive in relation to the legitimate objective.  *Id.*

Judge Jones in *Thakker* reached a different conclusion.  *Thakker*, 2020 WL 1671563, *8.  Judge Jones noted that an express intent to punish was not necessary and then found that the detention in question did not bear a rational relationship to a legitimate government objective.  *Id.*  Judge Jones reasoned that housing immigration detainees in close proximity and in unsanitary conditions, in light of the pandemic, did not meet a legitimate governmental objective.  *Id.*  Judge Jones indicated that preventing aliens from absconding would constitute a legitimate governmental aim but this objective was deeply weakened in light of COVID-19, particularly when ICE had many other options to monitor civil detainees.  *Id.*

The Court agrees with the *Thakker* court that COVID-19 alters the analysis.  The Court also recognizes that jails are not designed with pandemics in mind.  However, courts that have found that the conditions did not bear a rational relationship to a legitimate governmental interest in light of the pandemic, have also indicated that the individual detainee's underlying health condition weighed heavily in its analysis.  *See, e.g.*, *Rafael L.O. v. Tsoukaris*, 2020 WL 1808843, *8; *Thakker*, 2020 WL 1671563, *4, 6.  The Court also agrees that a petitioner's individual circumstances (that is, his or her medical condition) are critical to the analysis.

Petitioner submits that being confined in a facility such as ECCF coupled with his pre-existing medical conditions and age places him at high risk of suffering severe complications or even death should he contract COVID-19.  D.E. 5 at ¶ 7.  He further submits that his underlying state criminal matter has been unduly prolonged due to courthouse closures in the wake of the ongoing pandemic, resulting in his delayed detention at ECCF.  *Id.* at ¶¶ 46-49.  Respondents argue, among other things, that Petitioner has submitted minimal evidence to support his claim

and failed to demonstrate a basis for relief.   D.E. 8 at 26-27.   As Respondents point out, Petitioner does not claim to live with any of the COVID-19 risk factors identified by the CDC. *See Coronavirus Disease 2019: Groups at Higher Risk for Severe Illness.* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. (last visited June 11, 2020).

Petitioner submits that he is obese, has gastroenteritis, borderline diabetes,[19] and mental health issues.   In support of his health condition related claims, Petitioner has submitted one page of ECCF medical records as well as a photograph of stitches in his abdominal area.   D.E. 1-2 at 2-3.   During oral argument, Petitioner submitted for the first time that he takes immunosuppressive medications which can place him at higher risk of contracting COVID-19. The Court will sustain the Respondents' objection to the introduction of this new information. Petitioner cannot amend his petition through briefing or argument.   *See Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984)).   Petitioner has not alleged that he is living with any of the health conditions listed as risk factors by the CDC.   Petitioner has provided that he is obese, but not severely obese.   The CDC's COVID-19 risk factors lists *severe* obesity, which is qualified as a BMI greater than *or equal to 40*.   (emphasis added).   *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html

---

19 Borderline diabetes is also known as prediabetes.   It is a condition that develops before a person is diagnosed with type 2 diabetes.   A prediabetic individual's blood sugar levels are higher than normal, but they are not high enough to be considered a sign of diabetes.   *See* https://www.cdc.gov/diabetes/library/features/truth-about-prediabetes.html (last visited June 12, 2020).

(last visited June 8, 2020).   Finally, Petitioner's age, thirty-seven, does not place him in the at-risk age range identified by both ICE and CDC.   *See* D.E. 8-3 at 1.

In sum, the Court credits Petitioner's complaints as to ECCF.   While ECCF has implemented steps that have worked to lessens the frequency and number of infections, its efforts have not been completely successful.   But Petitioner's alleged medical conditions do not fall within the CDC guidelines for placing him in an unusually vulnerable category.   As a result, the Court finds that Petitioner's detention serves a legitimate governmental interest.   Therefore, the Court does not find that Petitioner is likely to succeed on his claims.   Petitioner's request for immediate release is denied.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that it has jurisdiction over this matter, but the Court denies the Petition.   Because Petitioner's habeas petition is denied, he is not entitled to fees and attorney costs pursuant to EAJA.   An appropriate Order accompanies this Opinion.

Dated:   6/16/2020

JOHN MICHAEL VAZQUEZ
United States District Judge